

U.S. Department of Justice

United States Attorney
Eastern District of New York

EAG  
F. #2018R01021

271 Cadman Plaza East  
Brooklyn, New York 11201

May 6, 2021

<u>By ECF</u>

The Honorable Brian M. Cogan  
United States District Judge  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    <u>United States v. Primo Cassarino</u>  
                  <u>Criminal Docket No. 19-442 (S-1) (BMC)</u>

Dear Judge Cogan:

        The government respectfully submits this letter in connection with the sentencing of the defendant Primo Cassarino and in response to the defendant's sentencing memorandum, filed on April 29, 2021, and his March 4, 2021 letter setting forth his objections to the Pre-Sentence Investigation Report ("PSR"), prepared on March 4, 2021. Sentencing is currently scheduled for May 13, 2021. In his memorandum, the defendant seeks a sentence of 12 months and a day' imprisonment. For the reasons described herein, the government respectfully asks the Court to impose a sentence within the applicable Guidelines range, which the government submits are 21 to 27 months' imprisonment.

BACKGROUND

I.      <u>Offense Conduct</u>

        Beginning in or about 2018, the individual identified in the superseding indictment and herein as John Doe #6 started to place bets on sporting events with co-defendant Joseph Amato, Jr. According to the defendant (and the government credits his account as to this point), Amato, Jr., had a half-sheet with Cassarino, such that Amato, Jr., and Cassarino would split any losses incurred by John Doe #6. During the time John Doe #6 placed bets with Amato, Jr. (and Cassarino), John Doe #6 incurred a debt in excess of $30,000. Because of Cassarino's arrangement with Amato, Jr., the debt was owed jointly to Amato, Jr., and co-defendant Primo Cassarino. To pay off the loan, Amato, Jr., arranged for

the John Dunn to loan $30,000 to John Doe #6. Some of communications regarding these arrangements were intercepted on a court-authorized wiretap and are described below.

For example, on December 4, 2018 at 2:32 p.m. (JR #239), Amato, Jr., spoke with John Doe #6 about arrangements he was making to obtain a loan to John Doe #6 and advised him that he had arranged for someone to loan John Doe #6 an amount between $27,000 and $30,000. A transcript of a portion of the conversation is below.

| | |
|---|---|
| AMATO, JR.: | Yo, listen, um, what I can tell you is bro, like you know, bro, obviously, after all the time that it's been, you haven't gotten us anything, and we set the thing up for you, and everything, you know, I think you know, 27, like you know, is more than a fair deal, because that's what it was from the beginning when I last spoke to you, with the deal on top of the deal . . . what I can tell you is . . . they're the type of a people … give them a little time bro … show them you are doing right by them and they'll do right by you again. They can probably increase what they gave you already. |
| John Doe #6: | No, no, I definitely hear you. |
| AMATO, JR.: | Let's clear this up, and then, give it a month. Give it like three weeks, whatever it is, they'll see you're on time do the right thing. They can probably help you with the rest. |
| John Doe #6: | Yeah … no … definitely … the total loan is going to be 30? |
| AMATO JR: | Anywhere from 27-30. I'm not sure how they want to do it. I didn't get that far. |
| John Doe #6: | If you can get me like around 30 . . . just so I can have 3 or 4 grand just to pay off other shit, just so I can afford the weekly payments for this guy, you know? It would be easier if I could just pay off 3 to 4 thousand to someone else so like 27 works for you, 4 or 5 works, so 30 total, 31 total. |
| AMATO, JR.: | I'll let you know … it's probably gonna be between the 27-30 maybe a thousand or two different, bro. You know, for yourself, whatever you want to do with. But please, one thing, just make sure you're available tonight around 9 or 9:30. |

When John Doe #6 said that he wanted an extra few thousand dollars ("3 or 4 grand") to be able to "afford the weekly payments," John Doe #6 was referencing the fact that John Doe #6

2

would be expected to repay the loan on a weekly basis and he wanted some funds to make those payments (given that the majority of the funds would be immediately used to repay the outstanding gambling debt).  When Amato, Jr., said to John Doe #6 that "it's probably gonna be between 27-30 maybe a thousand or two different," he was referring to the amount of the loan.  Approximately two hours later, at 4:56 p.m. (JR #262), Amato, Jr., and Cassarino, had the following conversation:

> CASSARINO: What time can the kid be around?
>
> AMATO JR.: I think he may be around earlier than 9:30 p.m., hopefully, I told him I'd like to get it over with sooner than later, I'm just waiting to hear back from him.  How much we giving him?  30?
>
> CASSARINO: Yeah.  We're giving him 30, and then me and you get 13.5 each.
>
> AMATO JR.: Yeah, he thinks we owes him 27, he owes us 27.
>
> CASSARINO: Yeah, I mean – I can't get – it's really 34.
>
> AMATO JR.: He'd rather more though for other shit out there he wants to take care of.
>
> CASSARINO: Yeah, but the only thing is I told him, we'll figure it out.  The only thing is I told this kid that I would give him 3 for doing this for us.  Whatever we'll figure it out.
>
> * * *
>
> CASSARINO: Lie to the kid, be like not for nothing this is almost two months old, be like 'the kid wants 30, that's it.'
>
> AMATO JR.: Yeah.
>
> * * *
>
> CASSARINO: Yeah, no, the thing I promised this kid Slacks, is basically the red thing so I was like, you can just have the 3 and me and you will take the 27.  Listen, it's better than what we had the last two months.
>
> AMATO JR.: For sure.

During this call, Amato, Jr., and Cassarino agreed that John Doe #6 would use $27,000 of the money he received from the new loan to repay $27,000 that John Doe #6 owed to Cassarino and Amato, Jr., ("me and you get 13.5 each"); that John Doe #6 actually owed $34,000 (not just $27,000) to Cassarino and Amato, Jr., ("it's really 34"); that Cassarino wanted Amato, Jr., to tell John Doe #6 that he owed $30,000 ("be like, 'the kid wants 30, that's it.'"); and

3

that Cassarino had promised another individual, "Slacks," "three," or $3,000, for coordinating the loan ("doing this for us"). The reference to "Slacks" was a reference to John Dunn, the individual who was coordinating the new loan and to whom Cassarino promised $3,000 in exchange.

Wiretap intercepts showed that Amato, Jr., confirmed with his father, Joseph Amato, who at the time held the position of a captain of the Colombo family, the details of the loan terms involving John Doe #6. At 5:12 p.m. (JR #269), Amato, Jr., and Amato arranged to meet at a Starbucks. While apparently together, Amato, Jr., called Cassarino at 5:16 p.m. (JR #270):

| | |
|---|---|
| AMATO JR.: | Yo, uh how much is this kid gonna be seein' them with every week? He wants to know. |
| CASSARINO: | Five. |
| AMATO JR.: | Five flat? |
| CASSARINO: | Yeah. |
| AMATO JR.: | Alright, cause, ya know, he just wants to make sure that he's good for it. But, he'll be, he'll be fine with that (UI). |
| CASSARINO: | Um, hold on, let me see, that might be him, I'm gonna call you right back. |

When Cassarino said "five flat" to Amato, Jr.'s question about how much John Doe #6 would "be seeing them with every week," Cassarino meant that John Doe #6 would make weekly payments to "them" of $500. A review of telephone records shows that Cassarino's next phone call, also at 5:16 p.m., was with a telephone number used by John Dunn.

Roughly a minute later, at 5:17 p.m. (JR #271), Amato, Jr., called John Doe #6, and told him what Cassarino had told Amato, Jr., that "the numbers were better than I thought. It's going to be five flat"; that "he [referencing Cassarino] said that he expects the whole 30 though"; and that "29 would mean like you know cutting into my [Amato, Jr.'s] end of it." John Doe #6 pleaded with Amato, Jr., to take "28," or $28,000, "I could take care of like one person," but stated that he realized he had "no other choice."

Thereafter, John Dunn gave John Doe #6 approximately $30,000. When they met, Dunn made a copy of John Doe #6's driver's license, using Dunn's phone. Initially, Dunn told John Doe #6 that he needed to pay $500 every two weeks in interest until he paid off the principal. Thereafter, Dunn agreed that he could pay $67,500, made in biweekly installments of $750, to satisfy the loan and that the initial $500 biweekly payments would be applied to that debt.

John Doe #6 could not always make timely payments, leading Dunn and others to threaten John Doe #6 on multiple occasions. On one occasion, Amato, Jr., and others encountered John Doe #6 at Play Sports Bar, where an individual who identified himself as Dunn's cousin assaulted John Doe #6 in a manner that made John Doe #6 feel as though his safety was in jeopardy if he failed to make timely payments. Around Easter of 2019, Dunn called John Doe #6 and told him to come outside his residence. John Doe #6 did so and Dunn and the individual who identified himself as Dunn's cousin told John Doe #6 to get into Dunn's black Jaguar. Again, Dunn and his "cousin" made clear to John Doe #6 in their words and actions that harm would come to him if he fell behind on payments. Finally, on July 16, 2019, after John Doe #6 missed a payment, Dunn sent John Doe #6 a text message that said that he would "die in the street before I let someone beat me" on a loan. Again, John Doe #6 construed the text message as a threat and believed harm would come to him if he fell behind on the loan. On or about July 26, 2019, Cassarino also assisted Dunn in attempting to collect payments from John Doe #6. He introduced himself by text message as "[o]ne of johns friends" and made arrangements to meet John Doe #6 to pick up a payment.

***

The defendant was arrested on October 3, 2019 and was released the same day on a bond. On September 29, 2020, Cassarino pleaded guilty to collection of an extortionate extension of debt (the offense charged in Count Eighteen of the superseding indictment).

DISCUSSION

I. The Defendant's Objections to the PSR

The defendant objects to several components of the PSR.

A. The Defendant Is Not Entitled to a Minor Role Reduction

First, the defendant argues that he is entitled to a two-level reduction under U.S.S.G. § 3B1.2(b) for playing a minor role in the offense. The government disagrees. An individual is eligible for a minor role where he "[wa]s less culpable than most other participants, but whose role could not be described as minimal," id. Application Note 3. "In assessing the applicability of this adjustment, the sentencing court must gauge the defendant's culpability in light of the elements of the offense of conviction as well as in relation to the culpability of the other participants." United States v. Finkelstein, 229 F.3d 90, 97 (2d Cir. 2000).

Put simply, the government submits that the defendant has not been candid with the Court as to his role in the offense. For one, his claim in his sentencing memorandum that he merely received proceeds he was owed from a gambling debt and did not participate in arranging the loan is inconsistent with his statements during the guilty plea hearing that he used the implicit threat of violence to collect the loan and is contrary to the evidence. See Def. Mem. at 5 ("The terms and conditions of repayment were dictated and directed by others before Mr. Cassarino received his portion of the payment. Mr.

5

Cassarino's role was <u>limited solely</u> to collecting that portion of the proceeds pursuant his agreement on the 'half sheet'.") (emphasis added). It is similarly disingenuous and contrary to his guilty plea for Cassarino to suggest he did not assist in any way in collecting the loan and deny an understanding that extortionate means could be used to collect the debt. See <u>id.</u> at 6 ("At no time, did Mr. Cassarino assist or have any interest in assisting anyone in attempting to collect payments from [John Doe #6]. Mr. Cassarino's limited involvement ended after he collected his portion of the debt. He had no reason to be involved in the collection or coordination for repayment."); <u>id.</u> at 5-6 ("Mr. Cassarino never directly or indirectly, made any threats of violence against [John Doe #6] or have any type of understanding, express or implied that any delay or failure to make repayment could result in the use of violence or other criminal means to cause harm to his person, reputation or property."). In fact, Cassarino's claims suggest that the defendant has not in fact accepted responsibility for the offense and, if he maintains the claims he set forth in his memorandum, the government respectfully submits that Cassarino may not be eligible to receive a three-level reduction for acceptance of responsibility.

Contrary to the defendant's claims, the evidence supports that Cassarino was the one who arranged with John Dunn to extend the $30,000 loan to John Doe #5. As an initial matter, both Amato, Jr., and Cassarino had burner phones that they used to communicate and therefore, all of their telephone conversations were not intercepted through the wiretap on Amato, Jr.'s primary phone.[1] (The wiretap on Amato, Jr.'s telephone commenced in or about December 2018 and calls prior to then also were not intercepted.) In any event, telephone records show regular communication between Cassarino and John Dunn and no communication between Amato, Jr., and Dunn, strongly suggesting that it was Cgassarino – not Amato, Jr. – who arranged for Dunn to extend the loan to John Doe #6. Cassarino's role in arranging the loan is also evidenced from calls that were intercepted on the wiretap on Amato, Jr.'s primary phone. For example, in an intercepted telephone call on December 4, 2019 (JR #208), <u>Cassarino</u> explained to Amato, Jr., that "Slacks" – a nickname for Dunn – "don't want me there," referring to the time that Dunn met with John Doe #6 to extend the loan. That same day (JR #262), <u>Cassarino</u> told Amato, Jr., "I promised this kid Slack is basically that red thing so I was like you, you can just have the 3 and me and you will take the 27." In so saying, Cassarino was explaining to Amato, Jr., that Cassarino had promised to give Dunn, $3,000 of the initial $30,000 that was lent to John Doe #6 and Cassarino and Amato, Jr., would split the remaining $27,000 to settle the gambling debt owed by John Doe #6 to them. <u>Cassarino</u> also was the one who communicated to Amato, Jr., the terms of the loan. In a call on December 4, 2019 (JR #270), Amato, Jr., called Cassarino

---

[1] On December 17, 2018 at 6:11 p.m. (JR #2409), Amato, Jr., using his primary phone, called Cassarino on his primary phone, (347) 764-0598 (the "0598 Telephone"). When Cassarino answered, Amato, Jr., said, "Yo, I just called you on the other thing." Cassarino responded, "Yeah, you know what it is, I left it home. I'm not home. Call me back here." Amato, Jr., agreed and the call was terminated. When Amato, Jr., referenced "the other thing," he was refereeing a second telephone that Cassarino used.

6

and asked, "Yo, uh how much is this kid gonna be seein' them with every week?  He wants to know." and Cassarino answered, "Five," referring to $500 per week.

In addition, Cassarino assisted Dunn in trying to collect payments on the debt owed by John Doe #6.  In February 2019, Cassarino reached out to Amato, Jr., to ensure that John Doe #6 would prioritize the debt owed to Dunn.  In a call on February 12, 2020 (JR #865), Cassarino said, "Do me a favor, if you talk to this [last name of John Doe #6]. … Just uhh, yo see what he could do uhh weekly without it interfering with the other kid [referring to Dunn].  And I'll work on it from there."  He ended the call saying, "So just try and look try and get that answer today if you could."  Several months later, on July 26, 2019, Cassarino, using his primary phone (the 0598 Telephone), sent a text message to John Doe #6, telling him that he was "Johns friend," asking to meet "earlier … then [sic] 9" and telling him that he would "come to [John Doe #6]."  When John Doe #6 asked Cassarino who he was, Cassarino wrote, "One of johns friends I never met you before[.]"  Continuing he wrote, "Just answer please I'm coming back out there to do John the favor don't make me come back out there for nothing ty[.]"[2]

Finally, the government submits that there is a preponderance of evidence showing that Cassarino is the individual that Dunn introduced as his cousin.  Telephone records show that Cassarino and Dunn were in regular telephone communication for the duration of the loan extended to John Doe #6.  And although John Doe #6 did not identify a photograph of a younger Cassarino as the "cousin," John Doe #6 described the cousin as "tall" (Cassarino is over six feet tall) and subsequently viewed a different photograph of Cassarino that was posted on the internet and recognized that individual as the "cousin."[3]  If Cassarino was the "cousin," Cassarino's claim to John Doe #6 that "I never met you before" would be false, but that makes sense given that Cassarino was trying to persuade John Doe #6 to meet him that night and would have wanted him to feel at ease.

Regardless of whether Cassarino was the "cousin," his role simply cannot be described as minor.  He recruited Dunn to arrange the loan, received a payout of $13,500 as a

---

[2] The same day that Cassarino sent text messages to John Doe #6, John Doe #6 told Dunn, by text message, that two FBI agents had come to his house.  Dunn did not respond to John Doe #6's text messages and instead, Cassarino sent the text messages described here.  Cassarino also appeared to be concerned that John Doe #6 was cooperating with law enforcement because he then tried to cover his tracks, writing "Hey just so I know what's going on this is something to do with rims on a car right?  Or something you ordered from youre [sic] mustang[.]"

[3] More recently, John Doe #6 described the "cousin" as taller than John Doe #6.  Based on information known to the government, Cassarino is actually about two inches shorter than John Doe #6.  Nonetheless, in light of John Doe #6's identification of Cassarino and Cassarino's connection to Dunn and role in the offense, a preponderance of evidence shows that Cassarino (and not someone else) was the "cousin."

result of the loan, stayed in regular communication with Dunn and tried to collect money from John Doe #6 when John Doe #6 fell behind.

### B. The Defendant's Role in the Colombo Family

Second, the defendant objects to the characterization of him in the PSR as an associate of the Colombo organized crime family of La Cosa Nostra. The government submits Cassarino is an associate of the Colombo family. The defendant was in telephone contact with both Joseph Amato, a captain in the Colombo family, and Thomas Scorcia, an inducted member of the Colombo family. He also operated a half-sheet with Amato, Jr., an arrangement that almost certainly was approved by Amato.

The government also submits that the background of the Colombo family is accurate and properly included in the PSR. Indeed, prior to obtaining the $30,000 loan for John Doe #6, Amato, Jr., specifically sought and received the approval of his father, a captain in the Colombo family.

## II. The Guidelines Calculation

The government submits that the following Guidelines calculation applies.

| | | |
|---|---|---:|
| Base Offense Level (§2E2.1(a)) | | 20 |
| Less: | Acceptance of Responsibility (§ 3E1.1) | -3[4] |
| Less: | Global resolution (§ 5K2.0) | <u>-1</u> |
| Total: | | <u>16</u> |

This total offense level, combined with a Criminal History Category I, carries a range of imprisonment of 21 - 27 months.

## III. A Sentence Within the Applicable Guidelines Range is Warranted

The government respectfully submits that, in this case, a sentence within the advisory Guidelines range is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

---

[4] The government reserves the right to argue that the defendant is not entitled to a reduction for acceptance if he maintains his claims minimizing his role in the offense.

A.  Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B.  Analysis

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range – and not a sentence of 12 months and a day of imprisonment, as requested by the defendant – is appropriate in this case.

1.  The Nature and Circumstances of the Offense

The defendant has been convicted of a serious crime: extortionate collection of an extension of credit, a crime he committed in connection with the Colombo crime family. When, as here, a loansharking customer fails to timely repay a loansharking loan, individuals like the defendant are able to use the violent reputation of the Colombo family and its vast resources, and engage in violence if necessary, to ensure that the customer pays. Because loansharking operations allow dangerous criminal organizations such as the Colombo family to earn money, these crimes are necessary for the Colombo family's survival. And, because loansharking can lead to violent debt collection, this crime is particularly serious and warrants a sentence with the Guidelines range.

2.  The Defendant's History and Characteristics

While the defendant does not have a prior criminal history, he has committed other crimes, namely, he operated an illegal and lucrative sports-betting operation and supervised others as part of the business. In fact, by his own admission, and supported by wiretap intercepts, Cassarino offered Amato, Jr., a half-sheet. Notably, the gambling

9

business generated significant profits for the operators and significant debts for the gamblers, which in turn led to loansharking loans as the one involving John Doe #6.

### 3. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offense – the use of extortionate means to collect an extension of credit – is serious. In addition, by engaging in criminal activity with the Colombo crime family, the defendant leveraged the threat of danger posed to the community by organized crime, and thereby demonstrated that he lacks respect for his community and the law.

### 4. Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

In this case, specific deterrence and incapacitation are critical. Given the need for deterrence and incapacitation, the government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(C). Indeed, it would not sufficiently deter the defendant from engaging in similar conduct in the future, from which he would still stand to profit financially. In addition, a sentence within the advisory Guidelines range is necessary to deter others who are in a position to choose between a law-abiding life and a life of crime.

### 5. Avoiding Unwarranted Disparities

Finally, a sentence within the Guidelines range is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

10

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence within the applicable Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a).

                    Respectfully submitted,

                    MARK J. LESKO
                    Acting United States Attorney

By:   /s/
        Elizabeth Geddes
        Megan E. Farrell
        James McDonald
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of the Court (BMC) (by ECF)
       Patricia Sullivan (by e-mail)
       Vincent Licata, Esq. (by ECF)